## In the United States District Court
## for the Western District of Pennsylvania

|  |  |
|---|---|
| **LISA BEEBE** | ) |
|  | ) |
| *Plaintiff* | ) |
|  | ) |
|  | )    **Civil Action No. 05-358E** |
|  | ) |
| **JO ANNE BARNHART,** | ) |
| **Commissioner of Social Security,** | ) |
|  | ) |
| *Defendant* | ) |
|  | ) |

## OPINION

Pending before the Court are the Motions for Summary Judgment of Plaintiff Lisa Beebe

(Doc. #8) and Defendant Commissioner of Social Security (Doc. #10). Plaintiff filed a claim for

benefits under Title II and Title XVI of the Social Security Act. Plaintiff filed her application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on October 6,

2003, alleging disability due to neck and back pain and emotional problems.

Plaintiff's claim was denied initially on January 24, 2004. Plaintiff requested a hearing

before an Administrative Law Judge on March 8, 2004 and on December 13, 2004, the ALJ

conducted the hearing. On April 8, 2005, the ALJ rendered his decision, denying Plaintiff's

claims for DIB and SSI benefits.

Plaintiff then requested an appeal of the ALJ's decision. The Appeals Council denied

Plaintiff's request for review and upheld the ALJ's decision on October 6, 2005. Plaintiff filed

this action on October 6, 2005.  For the reasons stated herein, Plaintiff's Motion for Summary

Judgment is denied and Defendant's Motion for Summary Judgment, requesting that we affirm

the Commissioner's decision denying Plaintiff's claims for DIB and SSI is granted.

## I. Standard of Review.

The standard of review in social security cases is whether substantial evidence exists in the record to support the Commissioner's decision. Allen v. Bowen, 881 F.2d 37, 39 (3d Cir. 1989). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The Commissioner's findings of fact, if supported by substantial evidence, are conclusive. 42 U.S.C. §405(g); Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir. 1979). The Administrative Law Judge ("ALJ"), however, must evaluate all relevant evidence and explain his reasons for rejecting any such evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002).

## II. The ALJ's Decision.

On April 8, 2005, the ALJ rendered his decision and denied Plaintiff's claim for benefits, finding that Plaintiff was not disabled within the meaning of the Social Security Act. R. 18.

The ALJ followed the five-step evaluation set out at 20 CFR §§ 404.1520 and 416.920. R. 19.

### A. Step One.

At step one, the ALJ must determine whether the claimant is engaged in substantial gainful activity. Here, the ALJ found that Plaintiff has not engaged in substantial gainful activity since the day she alleges her disability began. R. 19.

### B. Step Two.

At step two, if the claimant is not engaged in substantial gainful activity, then the ALJ must determine whether the claimant has a severe impairment. Here, the ALJ found that Plaintiff suffers from degenerative disc disease, chronic cervical and lumbar myofascial syndrome, and

2

recurrent major depression, and that these medically-determinable impairments are severe under
the Act because they significantly limit the claimant's ability to perform work activities. R. 19.

## C. Step Three.

At step three, the ALJ must determine if the claimant has a severe impairment which

meets or equals the criteria of a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1. Here, the

ALJ found that Plaintiff does not have any impairment that meets or equals said criteria.

Specifically, the ALJ evaluated Plaintiff's history of musculoskeletal problems under the criteria

of the impairments listed in section 1.00, Musculoskeletal System, and the Plaintiff's emotional

complaints under 12.00, Mental Disorders and found that none of the medical findings

concerning the Plaintiff's impairments met or equaled the criteria for severity in any of those

listings. R. 19-20. The ALJ also evaluated Plaintiff's emotional complaints under listing 12.04,

Affective Disorders. R. 20. The ALJ found that Plaintiff exhibited some, if not all of the

symptoms required by Part A of listing 12.04, but that the record did not show a marked or

equivalent limitation in two (in fact in any) of the four categories set out in part B of 12.04:

[s]he is able to manage a household for herself and two young children. I find that
she has moderate difficulty maintaining social functioning. The claimant has a
limited social life, but no serious incident in this area, such as altercations or
difficulties with authority figures. The record shows she is limited socially but is
functional. She continues to relate and associate with family members and attends
medical appointments as required. Dr. Qureshi's records (Exhibits 12F, 20F)
show limitations, but do not indicate that she could not maintain simple, repetitive
unskilled work within the RFC adopted here. The record does not show repeated
episodes of decompensation, each of extended duration. In fact, no such episode is
recorded, which attests to a lack of disabling severity.

R. 20. The ALJ used all of the same above-quoted facts to conclude that the criteria of part C of

12.04 also was not satisfied. R. 20.

3

## D. Step Four.

At step four, the ALJ must determine, if the impairment does not satisfy one of the listings, whether the claimant's impairments prevent her from performing her past relevant work. Here, the ALJ found that Plaintiff's past relevant work is precluded by her current impairments. R. 26.

## E. Step Five.

At step five, the ALJ must determine, if the claimant is incapable of performing past relevant work, if she can perform any other work which exists in the national economy, in light of her age, education , work experience and residual functional capacity. Relevant to this inquiry, the ALJ found that the Plaintiff had the residual functional capacity ("RFC") to perform work that is not above the light exertional level that does not require more than simple, repetitive unskilled tasks; with no more than incidental interaction with the public; or more than routine work processes and settings; or any high stress; defined as high quotas; or any close adherence to quality production standards. R. 20.

In reaching this conclusion about Plaintiff's RFC, the ALJ discussed the Plaintiff's testimony at the ALJ hearing. R. 21. The ALJ then discussed the medical records relevant to Plaintiff's degenerative disc disease, chronic cervical and lumbar myofascial syndrome, and recurrent major depression. R. 21-24. The ALJ also discussed the medical opinions of the consulting psychologist J. Alexander Dale, Ph.D., of the non-examining state agency psychologist, Dr. Heil, of Plaintiff's treating psychiatrist Tariq Qureshi, M.D., and of the Actions Review Group (Annette Jadus, M.A. and Ronald Refice, Ph.D.). R. 23-25.

With respect to Dr. Dale's conclusions in December 2003, the ALJ concluded "I have carefully considered Dr. Dale's report, and I find that it does not demand a finding that the

4

claimant is disabled. Dr. Dale is not a treating source. Beyond this, the findings in his report are quite positive. Dr. Dale found several severe mental limitations, as I do here, but I believe that these have been accommodated in the residual functional capacity adopted here and discussed below, which provides for simple, repetitive unskilled work that does not require more than incidental contact with the public and no high stress in a routine work setting." R. 24.

Relevant to the state agency opinion, the ALJ stated that he had considered and concurred with this opinion, which was supported by the rationale of psychologist Dr. Heil. R. 25.

Relevant to Dr. Qureshi's conclusions concerning the Plaintiff, the ALJ stated: "I have considered Dr. Qureshi's assessment, but I further note that nothing in the therapy notes reflect support for the degree of limitation assigned." R. 24. With respect to Dr. Qureshi, the ALJ also stated that "Dr. Qureshi's findings are quite positive." R. 25.

The ALJ also discussed a vocational report from Action Review Group, Inc., which indicated that the Plaintiff was incapacitated by mental illness and physical problems. R. 25. "[D]ifferent organizations and agencies have different criteria for assessment of disability and I am not bound by such assessments. Moreover, I afford greater weight to the assessment from Dr. Dale with respect to the claimant's psychiatric limitations, along with current therapy notes from Dr. Qureshi showing that [Plaintiff] continues to do well on her current course of treatment." R. 25.

The ALJ also discussed Plaintiff's subjective assertions and found them not credible to the extent that Plaintiff claims she cannot sustain work within the parameters of the residual functional capacity adopted by the ALJ. R. 25.

The ALJ then discussed the testimony of the VE in response to his hypothetical of an individual of the claimant's age, education, residual functional capacity, and past relevant work

5

history, i.e. the VE's conclusion that such an individual could work as an office cleaner, hotel cleaner, or stock clerk. R. 27. The ALJ concluded that he did not accept the other limitations posed by Plaintiff's counsel because "the medical evidence does not support these interruptions within the parameters of the residual functional capacity adopted here." Id..

Finally, the ALJ concluded based upon the VE's testimony "that considering the claimant's age, educational background, and her relevant work experience, and residual functional capacity, she is capable of making a successful adjustment to work that exists in significant numbers in the national economy" and therefore, Plaintiff was not disabled. R. 27.

## III. Plaintiff's Arguments.

Plaintiff has presented the Court with a laundry list of reasons why her motion for summary judgment should be granted and benefits for DIB and SSI awarded to her.

Plaintiff's first major position is that "[i]t is only because of the errors of law by the ALJ . . . that the Plaintiff's claim for disability benefits was denied." Plaintiff's Supporting Brief, p. 10. In support of this position, Plaintiff first argues that the ALJ erred when he found that the opinion of Dr. Heil, the non-examining state psychologist was entitled to greater weight than that of Plaintiff's treating psychiatrist, Dr. Qureshi, because when Dr. Heil reviewed the record, he did not have before him Dr. Qureshi's treatment notes or December 2004 assessment. Plaintiff's Supporting Brief, p. 11-12. In a related argument, Plaintiff next argues that the ALJ failed to provide a "'good reason' for not crediting Plaintiff's medical treatment sources opinions and did not explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to set forth the weight, if any, that was given by the ALJ to the treatment notes and opinion of the Plaintiff's treating medical sources." Id. at 13.

6

Plaintiff also argues that the ALJ's RFC assessment was simply conclusory and did not provide any analysis or reference to support evidence as required by SSR 96-8p. Id.

Plaintiff also argues that the ALJ erred when he did not follow 20 C.F.R. § 416. 912(e)(1) and contact Dr. Qureshi for follow-up on his opinion. Id. at 14.

Additionally, Plaintiff argues that the hypothetical question posed by the ALJ was not supported by acceptable medical evidence of record and did not contain all the Plaintiff's impairments that are supported by the record. Plaintiff's Supporting Brief, p. 15. More specifically, Plaintiff argues that the ALJ did not incorporate into his hypotheticals any limitations as set forth by the Plaintiff's treating mental health provider, Dr. Qureshi, limitations that were provided post hearing, but which limitations Plaintiff contends her attorney proffered to the VE at the ALJ hearing. Id. at pp. 15-16.

Plaintiff's second main contention is that the ALJ's conclusion that Plaintiff can perform competitive employment is not supported by substantial evidence. Plaintiff's Supporting Brief, p. 17. This position is based upon Plaintiff's contention, already set forth above, that the ALJ erred when he failed to provide any explanation for why he disregarded the post-hearing opinion of Plaintiff's treating mental health provider, Dr. Qureshi, and did not give adequate weight to Plaintiff's treating medical sources. Plaintiff's Supporting Brief, pp. 17-19. "The ALJ in this case did not provide any explanation whatsoever to explain what medical evidence was used to substantiate his disregard of the Plaintiff's treating mental health providers." Id. at 18. Plaintiff also argues that "[t]he ALJ erred in not giving adequate weight to Plaintiff's treating medical sources." Id. at 19. Plaintiff also contends that the ALJ failed to comply with 20 C.F.R. §404.1527 and §416.927 and SSR 96-5p in that he failed to cite to medical opinions in the record to substantiate his rejection of pertinent medical evidence. Id. at 20.

7

**VI. Defendant's Contentions.**

In response, the Defendant Commissioner argues that substantial evidence supports the ALJ's decision that from July 15, 2003 through April 8, 2005, Plaintiff retained the residual functional capacity to perform the jobs identified by the vocation expert. More specifically, the Commissioner argues that the ALJ rightfully relied on the opinions of Dr. Dale and Dr. Heil to support his conclusion concerning Plaintiff's residual functional capacity. Defendant's Supporting Brief, pp. 11-12. Further, the Commissioner contends that the ALJ's decision was supported by Dr. Qureshi's observations in October, 2004, that Plaintiff "continues to do well on [her] current medication regimen and [is] maintaining a stable mental status." Id. at 12. Finally, the Defendant cites to the ALJ's observation that "[t]he record does not show serious side effects from [Plaintiff's] medication." Id. "All of this evidence, which includes the opinions of Drs. Dale and Heil, as well as the effectiveness of Plaintiff's medications, demonstrates that Plaintiff had the mental capacity to perform the jobs which the vocational expert identified. . . . Because substantial evidence supports the ALJ's decision that Plaintiff had no disabling mental impairment between July 15, 2003 and April 8, 2005, this Court should affirm the Commissioner's final decision denying Plaintiff's DIB and SSI claims." Id. at 13.

The Commissioner also contends that there is no merit to Plaintiff's argument that Dr. Qureshi's mental residual functional capacity assessment is entitled to controlling weight. On this issue, the Defendant first argues that the question of Plaintiff's residual functional capacity is a legal question for the ALJ, and not a doctor, to decide. Id. Furthermore, the Commissioner argues, "as the ALJ explained, the value of Dr. Qureshi's opinion regarding Plaintiff's mental residual functional capacity is diminished by the fact the 'nothing in the therapy notes reflect support to the degree of limitation assigned' by him." Id. at 14, quoting R. 24. Indeed, the

8

Defendant argues, Dr. Qureshi's treatment notes actually contradict his opinion on Plaintiff's residual functional capacity. Id. On the issue of Dr. Qureshi's opinion, the Defendant also argues that Dr. Qureshi's opinion is inconsistent with the entire case record, including the opinions of Drs. Heil and Dale. Id. Finally, the Defendant contends "[t]he ALJ did not, as Plaintiff contends substitute his own judgment for that of Dr. Qureshi. Rather, the ALJ applied the medical source opinion regulations at 20 C.F.R. §§ 404.1527(d), 416.927(d) and consistent with the regulations, appropriately gave little weight to Dr. Qureshi's opinion about Plaintiff's mental residual functional capacity." Id. at 15 (internal citations omitted).

Finally, The Commissioner also disputes the Plaintiff's contention that pursuant to 20 C.F.R. § 404.1512(e) and § 416.912(e), the ALJ had a duty to re-contact Dr. Qureshi for additional information or further clarification. Id. "An ALJ need only re-contact a medical source if the evidence is inadequate to determine whether a claimant is disabled and additional information is needed to reach a decision. . . . The record as a whole was sufficient for the ALJ to make an informed decision about Plaintiff's alleged mental disability." Id. at 15-16.

## IV. Legal Analysis.

### 1. The ALJ properly analyzed Dr. Qureshi's opinion on Plaintiff's residual functional capacity.

As indicated above, many of Plaintiff's arguments are directed to the manner in which the ALJ analyzed the residual functional capacity assessment conducted by Dr. Qureshi, Plaintiff's treating psychiatrist. On December 12, 2004, Dr. Qureshi filled out a Medical Assessment of Ability to Do Work-Related Activities (Mental) form concerning Plaintiff. R. 420. "Poor" was defined in the assessment as meaning the "ability to function in this area is seriously limited but not precluded." Id. "Fair" was defined in the assessment to mean the "ability to function in this

9

area is limited but satisfactory." Id. "None" was defined in the assessment to mean "[n]o useful ability to function in this area." Id.

The first category of questions answered by Dr. Qureshi involved "Making Occupational Adjustment." Id. Dr. Qureshi stated that Plaintiff's ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, deal with work stressors, function independently, and maintain attention/ concentration was poor and her ability to use judgment was fair. Id. Under "[d]escribe any limitations and include the medical/clinical findings that support this assessment," Dr. Qureshi stated "[p]oor concentration, auditory hallucinations and paranoid thoughts and depression." Id.

The second category of questions involved "Making Performance Adjustments." R. 421. Dr. Qureshi stated that Plaintiff's ability to understand, remember and carry out complex job instructions, to understand, remember and carry out detailed, but not complex job instructions, and to understand, remember and carry out simple job instructions was poor. Id. Under "[d]escribe any limitations and include the medical/clinical findings that support this assessment; e.g., intellectual ability, thought or organization, memory, comprehension, etc.," Dr. Qureshi stated "auditory hallucination, paranoid thought, depression and poor concentration." Id.

The third category of questions involved "Making Personal/Social Adjustments." R. 421. Dr. Qureshi stated that Plaintiff's ability to maintain personal appearance and demonstrate reliability was fair and her ability to behave in an emotionally stable manner and relate predictably in social situations was poor. Id. Dr. Qureshi did not provide any information in under "[d]escribe any limitations and include the medical/clinical findings that support this assessment." Id.

10

The fourth and final category of questions involved "Other Work-Related Activities" and

queried "[s]tate any other work-related activities which are affected by the impairment, and

indicate how the activities are affected. What are the medical/clinical findings that support this

assessment." R. 422. Dr. Qureshi stated "[t]his patient suffers from major depression with

psychotic features. Her attention and concentration is impaired and periodically she becomes

psychotic." Id.

In Fargnoli v. Massanari, 247 F.3d 34 (3d Cir. 2001), the Third Circuit court succinctly

summarized the state of the law on the treatment of treating physician's opinions:

> [u]nder applicable regulations and the law of this Court, opinions of a claimant's
> treating physician are entitled to substantial and at times even controlling weight.
> *See* 20 C.F.R. § 404.1527(d)(2); Cotter [v. Harris], 642 F.2d at 704. The
> regulations explain that more weight is given to a claimant's treating physician
> because
>
> > these sources are likely to be the medical professional most able to
> > provide a detailed, longitudinal picture of [the claimant's] medical
> > impairments(s) and may bring a unique perspective to the medical
> > evidence that cannot be obtained form the objective medical
> > findings alone or from reports of individual examinations, such as
> > consultative examinations or brief hospitalizations.
>
> 20 C.F.R. § 404.1527(d)(2). Where a treating physician's opinion on the nature
> and severity of a claimant's impairment is "well supported by medically
> acceptable clinical and laboratory diagnostic techniques and is not inconsistent
> with the other substantial evidence in [the claimant's] case record, it will be given
> "controlling weight." *Id.*
>
> Although the ALJ may weigh the credibility of the evidence, he must give some
> indication of the evidence that he rejects and his reason(s) for discounting that
> evidence. See Burnett, 220 F.3d at 121, Cotter, 642 F.2d at 705.

Id. at 43. Moreover, the Regulations set forth the manner in which medical opinions are to be

analyzed when they have not been given controlling weight:

11

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim,

12

including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 CFR § 404.1527(d).

Applying this law to the facts of our case, we find that the ALJ did not err when he did not give controlling weight to the opinion expressed by treating psychiatrist Dr. Qureshi and, in fact, gave little weight to Dr. Qureshi's December 2004 opinion. We further find that the ALJ's analysis of the weight given to Dr. Qureshi's opinion complied with the mandates of 20 C.F.R. §§ 404.1527 and 416.927. Dr. Qureshi's December 2004 assessment of Plaintiff rightfully was not given controlling weight because it was not "well supported by medically acceptable clinical and laboratory diagnostic techniques" and was "inconsistent with the other substantial evidence in [the claimant's] case record. 20 C.F.R.§§ 404.1527(d)(2) and 416.927. Specifically, Dr. Qureshi's December 2004 assessment of Plaintiff was not supported by his own treatment notes from March 2004 onward. See R. 24-25.

Dr. Qureshi began to treat Plaintiff in April, 2003. R. 292. After the April appointment, he did not see her again until June 11, 2003 after she had been discharged from Belmont Hospital where she had been treated for emotional problems. R. 291. Dr. Qureshi next saw Plainitff again

13

on June 26, 2003 and then, even though her alleged on-set date is July 15, 2003, he did not see Plaintiff again until September 9, 2003. Id.

Beginning in September, 2003, Dr. Qureshi began seeing Plaintiff on a bi-weekly, then monthly basis. R. 288-289, 387-402. Beginning in March 2004, Dr. Qureshi's notes about Plaintiff contain findings consistent with the residual functional capacity found by the ALJ. At her March 24, 2004 appointment with Dr. Qureshi, Dr. Qureshi found Plaintiff's depression has eased somewhat, and she denied any perceptual disturbances, her general presentation, affect and speech were appropriate, her mood was euthymic, her sleep, appetite, and energy were within normal limits, her attention/concentration was fair, and her thought process was organized and goal directed. At her April 21, 2004 appointment with Dr. Qureshi, Dr. Qureshi found Plaintiff was still mildly depressed because of her children's problems, but her general presentation, affect and speech were appropriate, her mood was euthymic, her sleep, appetite, and energy were within normal limits, her attention/concentration was fair, and her thought process was organized and goal directed. R. 394. At her May 19, 2004 appointment with Dr. Qureshi, Dr. Qureshi noted that Plaintiff was now sleeping better, denied any visual or auditory hallucinations, her general presentation, affect and speech were appropriate, her mood was euthymic, her sleep and energy were within normal limits, her appetite/nutrition was good, her attention/concentration was fair, and her thought process was organized and goal directed. R. 393. At her June 16, 2004 appointment with Dr. Qureshi, Dr. Qureshi noted that Plaintiff stated that she was feeling better, was complaining of mild anxiety, was still very stressed out, her general presentation, affect and speech were appropriate, her mood was anxious, she was using Ambien to sleep, her appetite/ nutrition and energy were within normal limits, her attention/concentration was fair, and her thought process was organized and goal oriented. R. 392. At her July 14, 2004 appointment with

14

Dr. Qureshi, Dr. Qureshi observed that Plaintiff stated that she is quite anxious and nervous due in part to taking care of her children, her general presentation, affect and speech were appropriate, her mood was anxious, her sleep was fair, her appetite/nutrition, attention/ concentration and energy were within normal limits, and her thought process was described as minimal suspiciousness. R. 391. At her August 11, 2004 visit with Dr. Qureshi, Dr. Qureshi noted that Plaintiff stated that she is doing fairly well, she was frustrated with her children's behavior problems and her relationship with her boyfriend, her general presentation, affect and speech were appropriate, her mood was anxious, her sleep, appetite/nutrition, attention/ concentration and energy were within normal limits, and her thought process was organized and goal oriented. R. 390. At her September 29, 2004 appointment with Dr. Qureshi, Dr. Qureshi stated that Plaintiff was stressed out due to her children's behavior and her back problems, Plaintiff's general presentation, affect and speech were appropriate, her mood was irritable, her sleep was fair, her appetite/nutrition was poor, her thought process was organized and goal oriented, and her attention/concentration and energy were within normal limits. R. 389. Finally, at her October 27, 2004 visit with Dr. Qureshi, the last visit memorialized in the record, Dr. Qureshi noted that Plaintiff continues to do well on current medical regiment, she maintains a stable mental status on current regiment, her general presentation, affect and speech were appropriate, her mood was euthymic, her thought process was organized and goal oriented, and her sleep, appetite/nutrition, attention/ concentration and energy were within normal limits. R. 388. Notably, for the first time since Plaintiff had started seeing Dr. Qureshi, Dr. Qureshi indicated at the conclusion of the October 27, 2004 appointment, that he did not need to see Plaintiff again for 2 months (versus the 2 or 4 weeks between appointments necessary in the past).

15

Dr. Qureshi's assessment also is inconsistent with the December 7, 2003 residual functional capacity assessment of Plaintiff by consultative psychologist J. Alexander Dale, Ph.D., whose opinion was supported by Dr. Qureshi's treatment notes. Plaintiff was seen by Dr. Dale at the request of the Commissioner. Dr. Dale diagnosed Plaintff as having bipolar disorder and borderline disorder. R. 317. He also noted that Plaintiff was unable to concentrate well. R. 316. He also noted with regard to Plaintiff's ability to get along with others, that Plaintiff was notably avoidant. Id. Dr. Dale's prognosis was "guarded." R. 317.

Dr. Dale filled out an assessment form about Plaintiff. R. 320-321. He noted that Plaintiff's ability to understand, remember, and carry out instructions was affected by her impairment. R. 320. In particular, he found that Plaintiff's ability to understand and remember short, simple instructions was slightly impaired, her ability to carry out short, simple instructions was slightly impaired, her ability to understand and remember detailed instructions was moderately impaired, her ability to carry out detailed instructions was moderately impaired, and her ability to make judgments on simple work-related decisions was moderately impaired. Id. Under medical/clinical findings that supported this assessment, Dr. Dale noted that regarding her ability to carry out instructions, Plaintiff admitted "No, I couldn't remember them." Id.

Dr. Dale also found Plaintiff's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting was affected by her impairment. Id. In particular, Dr. Dale found Plaintiff's ability to interact appropriately with the public, supervisors, and co-workers was slightly affected and her ability to respond appropriately to work pressures in a usual work setting, and to changes in a routine work setting to be moderately impaired. Id. Under medical/clinical findings that supported this assessment, Dr. Dale noted that Plaintiff reported having difficulty with people, losing her temper and throwing things. Id. Finally, Dr.

16

Dale noted that Plaintiff was not able to manage benefits in her own best interests. R. 321.

Additionally, the ALJ did not ignore Dr. Qureshi's treatment of Plaintiff "without good reason." To the contrary, in his decision, the ALJ cites to Dr. Qureshi's treatment notes and Dr. Dale's assessment to support his decision not to adhere to Dr. Qureshi's opinion. See R. 20 ("Dr. Qureshi's records (Exhibits 12F, 20F) show limitations, but do not indicate that she could not maintain simple, repetitive unskilled work within the RFC established here."); R. 25 ("Moreover, I afford greater weight to the assessment from Dr. Dale with respect to the claimant's psychiatric limitations, along with current therapy notes from Dr. Qureshi showing that [Plaintiff] continues to do well on her current course of treatment"); Id. ("Dr. Queshi's findings are quite positive").

### 2. The effect Dr. Heil's expert opinion.

We next address Plaintiff's argument that the ALJ erred when he gave great weight to the opinion of Dr. Heil, a state agency psychologist, citing SSR 96-6p in support of his conclusion. See Plaintiff's Supporting Brief, p. 11. SSR 96-6p provides in relevant part that:

> the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources.
>
> For this reason, the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.

17

In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating sources medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

Id. at 2-3.

There is no dispute that the ALJ gave great weight to Dr. Heil's opinion in making his decision to denying Plaintiff's claim for benefits. See R. 23 ("I have considered and concur with the opinion of the state agency (Exhibit 17F; 20 C.F.R. §§ 404.1527(f), 416.927 (f); Social Security Ruling 96-6p). In January 2004 the state agency concluded that the claimant could perform light work, as I do here.").

The basis for the Plaintiff's contention of error is that at the time Dr. Heil rendered his opinion, he had only reviewed the opinion of consulting psychologist Dr. Dale, and did not have the benefit of the treating records from Crawford County Counseling (i.e. Dr. Qureshi) or the Residual Functional Capacity assessment of Dr. Qureshi. The Court does not think error occurred because Dr. Heil did not to consider the assessment by Dr. Qureshi since it was not authored until December 14, 2004, almost one year after Dr. Heil issued his assessment. After reviewing the contents of Dr. Heil's January 6, 2004 opinion, we are, however, concerned that other than considering Dr. Dale's December 7, 2003 opinion, there is no indication of what other evidence in the record Dr. Heil actually reviewed. For while Dr. Heil concluded that "[t]he claimant is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment" and in so finding, indicated that he had examined "the

18

medical evidence and non-medical evidence in [the] file," in fact, there is no indication of what evidence, medical or non-medical, if any, Dr. Heil reviewed. See R. 337 ("[t]he examining source statements in the DD-164 [Dr. Dale's assessment] concerning the claimant's abilities in the areas of making occupational adjustments, making performance adjustments, and making personal and social adjustments are well supported by the medical evidence and non-medical evidence in file. Therefore, the DD-164 submitted by Dr. Dale, dated 12/07/03, is given great weight and adopted in this assessment."). Absent such information, Dr. Heil's opinion can not be a basis upon which the ALJ's decision can be affirmed.

Our analysis, however, is not over. We must now look to whether there is other evidence in the record from which the Court can conclude that there is substantial evidence in the record to support the ALJ's decision.

**3. Substantial evidence exists in the record to support the Commissioner's decision that between July 15, 2003 and April 8, 2005 Plaintiff has the residual functional capacity to engage in substantial gainful activity and therefore, Plaintiff was not disabled.**

After careful consideration of the record, contrary to Plaintiff's contention, we find that even without considering Dr. Heil's opinion, there is substantial evidence in the Record to support the ALJ's finding that from July 15, 2003 to April 8, 2005, Plaintiff had "the residual functional capacity to perform work that is not above the light exertional level that does not require more than simple, repetitive unskilled tasks; with no more than incidental interaction with the public; or more than routine work processes and settings; or any high stress; defined as high quotas; or any close adherence to quality production standard," and therefore, Plaintiff is not disabled under the Act.

19

With respect to Plaintiff's mental health impairments, the following information contained in the Record supports this conclusion. First, there are the treatment notes of Dr. Qureshi from March 2004 until his final treatment note in the record from October 2004, detailed above. Additionally, there is Dr. Dale's assessment, also detailed above.

The medical records relevant to Plaintiff's back pain and headaches also support the ALJ's decision. Upon her discharge from BHC Belmont Pines Hospital on June 2, 2003, Plaintiff's discharge papers noted that a neurological exam, scheduled because Plaintiff had experienced a blackout and dizziness, was normal. R. 162. A Discharge Summary dated June 30, 2003 from Terry Hemlock, P.T. of the Mind Body Wellness Center noted that Plaintiff had been seen for seven physical therapy sessions due to cervical spasms, tension headaches and right lumbosacral pain, and that in her previous visits, Plaintiff's pain had been a 1-2/10. R. 204. A lumbar spine MRI examination done on Plaintiff on July 24, 2003 showed focal central disc protrusion at L5, S1 and a mild disc bulge at L4, L5, but otherwise was normal. R. 223. An Out-Patient Physical Therapy progress note from the Meadville Medical Center dated September 2, 2003 stated under the subjective portion of the note that Plaintiff had not had a headache in over one week and C-S and LBP was improving. R. 266. A progress note from the Meadville Medical Center dated September 18, 2003 stated that Plaintiff has chronic neck and back pain and noted that Plaintiff "reported abolishment of c-s symptoms on 9-2-03 and centralized LB symptoms." R. 264. When Plaintiff was seen by Dr. James Macielak, M.D., FACS, in November, 2003, his impression was: (1) chronic cervical, shoulder girdle myofascial syndrome; (2) chronic lumbar myofascial syndrome; and (3) HNP L5-S1, which meant that Plaintiff "is going to have permanent neck and low back pain," but he also noted that Plaintiff had Waddell findings on physical examination which would suggest non-anatomical sources for her pain. R. 306-08. The

Functional Capacity Assessment of Plaintiff Dr. Kar completed on January 16, 2004, which was based upon Plaintiff's medical records and Plaintiff's own description of her activities of daily living, indicated that Plaintiff was able to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) about 6 hours in an 8-hour workday, sit (with normal breaks) about 6 hours in an 8-hour workday, basically be unlimited in her ability to push and/or pull, Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. R. 340-343. Plaintiff then did not see another doctor for physical health problems until March 19, 2004, when she began to be seen at the Conneaut Valley Health Center, Inc. R. 386. Plaintiff did not return to this practice for another two months, until May 18, 2004 when she came in complaining of low back and leg pain and neck pain. R. 383. Notably, the office got Plaintiff an appointment with an orthopedic surgeon, Dr. Welsh, in June, 2004, but Plaintiff did not attend the appointment because of a conflict and rescheduled for July, 2004. R. 382. Plaintiff also had not followed up with The Pain Clinic. Id. Plaintiff next went to the Emergency Department at the Meadville Medical Center on June 19, 2004 complaining of thoracic discomfort and a headache. R. 415. The provisional diagnosis was thoracic strain and Plaintiff's discomfort was relieved by Demerol and Phenergan. Id. An x-ray taken of Plaintiff's T-spine showed no evidence of acute fracture or dislocation; impression was normal thoracic spine. Id. at 415-416. Plaintiff was seen again at the Conneaut Valley Health Center on June 23, 2004, complaining of pain starting the lumbar spine, radiating into her right leg, and paresthesias of her entire right foot. R. 382. The doctor noted that Plaintiff was reporting tenderness to palpitation and tenderness through the lumbar spine with palpitation, but on examination, the doctor noted there was no point tenderness, no muscle spasm noted, straight leg lifts were without difficulty, and no pain was elicited. Id. On June 24, 2004, Plaintiff again went to the

21

Emergency Department at the Meadville Medical Center complaining of severe upper back, pain, neck pain and headache since the night before. R. 417. Physical exam showed tenderness in the paracervical muscles and suboccipital discomfort, more so on the right, from muscle spasm, no thoracic back pain, and mild lumbar back pain. Id. Plaintiff's diagnosis was tension headache. Id. On July 20, 2004, Plaintiff again was seen at the Conneaut Valley Health Center for back and neck pain, headaches, and leg numbness. R. 381. A MRI was taken of Plaintiff's cervical and lumbar spine on July 21, 2004 at the Meadville Medical Center; the impression was "normal MRI of the cervical and lumbar spines." R. 380, 414. Plaintiff went to the Emergency Department at the Meadville Medical Center on August 5, 2004, complaining of a two-day old left frontal throbbing headache. R. 413. She received Toradol 30 mg IV with good improvement and was prescribed Imitrex. Id. On August 11, 2004, Plaintiff went to Conneaut Valley Health Center because since starting to take Neurontin, she had been bruising; she denied any other problems. R. 375. Also on August 11, 2004, a physician record from the Emergency Department at the Meadville Medical Center indicates that Plaintiff went to the emergency room complaining of a headache. R. 412. It was noted that Plaintiff stated that she has had one of her regular intermittent headaches all day long and that Plaintiff was given Vicodin with mild to moderate improvement of her headache. Id. Plaintiff next went to Conneaut Valley Health Center, Inc. on October 19, 2004, complaining of headaches, some claudification symptoms, leg pain when she walks a certain distance, and worsening back pain. Id. The doctor noted that Plaintiff has documented mild disc disease, but nothing clinically significant, and concerning Plaintiff's extremities, reflexes were +2/4 and equal in both upper and lower extremities, muscle strength was +5/5 and equal in both upper and lower extremities. Id. A physician record from the Emergency Department at the Meadville Medical Center dated October 21, 2004 indicates that

22

Plaintiff went to the emergency room complaining of a severe throbbing headache. R. 406. The doctor noted that Plaintiff presented with a 1 day acute onset severe right sided throbbing headache with some mild photophobia, she denied any aura, nausea, vomiting, phonophobia, weakness, numbness or paresthesias, and she was given DHE 1 mg IV which resolved the headache. Id. The doctor also prescribed Maxalt for Plaintiff because she reported good relief with that medication in the past. Id. Finally, a vascular study of Plaintiff was done on October 21, 2004 at Dr. McLaughlin's request due to severe intermittent claudification of both legs, right greater than left; the conclusion was normal arterial evaluation with no evidence of significant arterial occlusive disease either at rest or with exercise. R. 407.

**4. The hypothetical question posed by the ALJ to the vocational expert and relied upon by the ALJ in concluding that Plaintiff had the residual functional capacity to work reflected all of the Plaintiff's exertional and non-exertional impairments that are supported by the record.**

"A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). The hypothetical question posed by the ALJ to the vocational expert upon which the ALJ ultimately relied in deciding the Plaintiff's residual functional capacity was: "[l]et's assume we have an individual 30 years of age. She has a high school equivalency education, work experience as you defined and described it. Let's assume that she's capable of light work activity for a exertional standpoint, is limited to simple and repetitive type tasks that require no more than incidental interaction with the public. She would be required to work in a routine work setting with routine

23

work processes, would not be able to work in a high stress type activity, which I'll define as work involving high quotas or close attention to quality production standards." R. 51-52. The ALJ did not "accept the other limitations cited by counsel" on the basis that he found "that the medical evidence does not support these interruptions within the parameters of the residual functional capacity adopted here." R. 27.

After careful consideration of the Record, we find that the above-quoted hypothetical, relied upon by the ALJ in reaching his conclusion that Plaintiff is not disabled, includes all of Plaintiff's limitations, exertional and non-exertional, that have support in the Record.

**5. The ALJ's Residual Functional Capacity assessment was not simply conclusory and provided a proper analysis as required by SSR 96-8p.**

In making his determination as to Plaintiff's residual functional capacity, the ALJ reviewed the Plaintiff's testimony, both at the ALJ hearing in various disability reports, the Plaintiff's medical records, Plaintiff's complaints of pain, the various medical opinions contained in the record, and Plaintiff's other subjective complaints. See R. 20-25. He then evaluated all of this information, explaining what evidence in the record supported his analysis, including an explanation of why he rejected certain contentions of the Plaintiff and Dr. Qureshi. R. 25-26. As such, the ALJ's residual functional capacity assessment was not conclusory and sufficiently complied with the mandates of SSR 96-8p.

**6. The ALJ did not have to re-contact Dr. Qureshi.**

Finally, the Court finds that the ALJ did not err when he did not re-contact Dr. Qureshi for additional information pursuant to 20 C.F.R. 404.1512(e) and 20 C.F.R. § 416.912(e). 20 C.F.R. 404.1512(e) provides in relevant part:

(e) Recontacting medical sources. When the evidence we receive from your

24

treating physician or psychologist or other medical source is inadequate for us to
determine whether you are disabled, we will need additional information to reach
a determination or a decision. To obtain the information, we will take the
following actions.

> (1) We will first recontact your treating physician or psychologist
> or other medical source to determine whether the additional
> information we need is readily available. We will seek additional
> evidence or clarification from your medical source when the report
> from your medical source contains a conflict or ambiguity that
> must be resolved, the report does not contain all the necessary
> information, or does not appear to be based on medically
> acceptable clinical and laboratory diagnostic techniques.

Id. See also 20 C.F.R. § 416.912(e) (same). Thus, the ALJ was required to recontact Dr. Qureshi
for additional information *only if* the evidence received from Dr. Qureshi was "inadequate for
[for the ALJ] to determine whether [Plaintiff is] disabled." See Thomas v. Barnhart, 278 F.3d
747, 758 (9th Cir. 2002) ("the requirement for additional information is triggered only when the
evidence from the treating medical source is inadequate to make a determination as to the
claimant's ability."). Here, the information provided by Dr. Qureshi was adequate to make this
determination. The ALJ simply determined that based upon the evidence in the record as a
whole, that Dr. Qureshi's December 2004 assessment of Plaintiff was not supported by the other
substantial evidence of record. See White v. Barnhart, 287 F.3d 902, 908 (10th Cir. 2001)
(internal citations omitted) ("it is not the rejection of the treating physician's opinion that triggers
the duty to recontact the physician; rather it is the inadequacy of the 'evidence' the ALJ
'receive[s] from [the claimant's] treating physician' that triggers the duty. The ALJ believed the
information he received from [the claimant's treating physician] was 'adequate' for
consideration; that is, it was not so incomplete that it could not be considered. However, the ALJ
also believed that the conclusion [the claimant's treating physician] reached was wrong; that is, it
was insufficiently supported by the record as a whole.").

## VI. Conclusion.

The Plaintiff's motion for summary judgment is denied and the Defendant's motion for summary judgment is granted. An appropriate order follows.

## VI. Conclusion.

The Plaintiff's motion for summary judgment is denied and the Defendant's motion for summary judgment is granted. An appropriate order follows.

*Maurice B. Cohill, Jr.*

Maurice B. Cohill, Jr.
Senior District Court Judge

March 30, 2007

26